JS-44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rachel K. Lader | Marc A. Brownstein et al. |

**(b)** County of Residence of First Listed Plaintiff   Nassau County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Maurice R. Mitts, Esquire and Mitts Law, LLC
1822 Spruce Street
Philadelphia, PA 19103; (215) 866-0110

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☑ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157 | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | **PERSONAL INJURY**<br>☑ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | |
| | **PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)
Brief description of cause:
Defamation and Related Torts

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   Greater than $75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☑ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*
JUDGE _____   DOCKET NUMBER _____

DATE   August 15, 2016

SIGNATURE OF ATTORNEY OF RECORD   Maurice R. Mitts, Esquire

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENTTRACK DESIGNATION FORM

| | | |
|---|---|---|
| Rachel K. Lader | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Marc A. Brownstein et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          (   )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.               (   )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (   )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                        (   )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                          (   )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( X )

| | | |
|---|---|---|
| August 15, 2016 | Maurice R. Mitts | Rachel K. Lader |
| Date | Attorney-at-law | Attorney for Plaintiff |
| | | |
| (215) 866-0110 | (215) 866-0111 | mmitts@mittslaw.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 141 Bristol Drive, Woodbury, NY  11797

Address of Defendant: 1134 Youngs Ford Road, Gladwyne, PA  19035

Place of Accident, Incident or Transaction: Pennsylvania

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                    Yes☐    No☑

Does this case involve multidistrict litigation possibilities?                                                                         Yes☐    No☑

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐    No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐    No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐    No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐    No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
      (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☑ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability --- Asbestos
9. ☐ All other Diversity Cases
      (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _____    _____    _____

Attorney-at-Law                                    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/15/2016    _____    50297

Attorney-at-Law                                    Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Rachel K. Lader,<br>141 Bristol Drive<br>Woodbury, NY 11797, | : <br> : <br> : <br> : | CIVIL ACTION |
| Plaintiff, | : <br> : | No. _____ |
| v. | : <br> : <br> : | |
| Marc A. Brownstein,<br>1134 Youngs Ford Road<br>Gladwyne, PA 19035, | : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| And | : <br> : | |
| Amy L. Brownstein,<br>1134 Youngs Ford Road<br>Gladwyne, PA 19035 | : <br> : <br> : <br> : | |
| And | : <br> : | |
| Molly R. Brownstein,<br>1134 Youngs Ford Road<br>Gladwyne, PA 19035 | : <br> : <br> : <br> : | |
| And | : <br> : | |
| The Pennsylvania State University,<br>201 Old Main<br>University Park, PA 16802, | : <br> : <br> : <br> : | |
| Defendants. | : <br> : | |

## COMPLAINT

Plaintiff Rachel K. Lader ("Rachel"), by and through her attorneys, Mitts Law, LLC and

McLaughlin & Stern LLP (pro hac vice application forthcoming) files this complaint (the

"Complaint") against Marc A. Brownstein, Amy L. Brownstein, Molly R. Brownstein

(collectively, the "<u>Brownsteins</u>") and The Pennsylvania State University ("<u>Penn State</u>"), and alleges as follows:

## NATURE OF ACTION

1.      This is a lawsuit about Marc A. Brownstein's unprincipled use of his status as a major alumni donor of Penn State to coerce that university to become complicit in the Brownsteins' campaign of harassment, defamation and torment against Rachel (the sorority sister of the Brownstein's daughter Molly R. Brownstein).

2.      In response to escalating pressure, Penn State capitulated to the Brownstein's complaints and started a baseless disciplinary proceeding against Rachel.  The proceeding related to a dispute between these sorority sisters (Rachel and Molly R. Brownstein) during a semester abroad in Spain over sightseeing trips, dirty dishes, music and the timeliness of responding to each other's text messages.  This ridiculous pretext of a "disciplinary proceeding" was not only unfounded (and beyond the jurisdiction of Penn State because it relates to conduct in Spain), but it became the vehicle for incessant torment of Rachel by the Brownsteins and Penn State that resulted in her inpatient hospitalization for days.

3.      Penn State not only brought these unfounded and inappropriate proceedings against Rachel to keep its wealthy donor happy, but even worse, Penn State divulged statutorily confidential information to the Brownsteins (which they in turn used to harass and disparage Rachel), flagrantly violated its own disciplinary policies, violated FERPA, breached its written confidential agreement with plaintiff and ultimately, even interceded on the Brownsteins' behalf to extort concessions from Rachel for the benefit of Molly R. Brownstein that involved the university offering to drop its trumped up disciplinary proceeding against Rachel if she would

agree to walk away from her lease at an off campus apartment and allow Molly R. Brownstein to have that apartment instead.

4.     Marc A. Brownstein's campaign to destroy his daughter's sorority sister is not only reprehensible in its own right, but regrettably, Marc A. Brownstein effectively implicated Penn State in conduct that deeply departed from integrity and professionalism, the most basic precepts of a university – particularly one that is a state actor and accountable for compliance with both state and federal laws.

5.     While it is undeniable that Marc A. Brownstein makes substantial financial donations to Penn State, that financial backing can never lawfully become the basis for complicity by Penn State for the harassment, extortion or a quid pro quo for the university's acquiesce or retaliation in return for payment.

6.     Based on this outrageous conduct, Plaintiff brings this action against the Brownsteins for defamation/defamation per se (Count I) and false light (Count II); and against the Brownsteins and Penn State for intentional infliction of emotional distress (Count III), negligent infliction of emotional distress (Count IV), intentionally harmful conduct, pursuant to the Restatement (Second) § 870 (Count V), and civil conspiracy (Count VI).

7.     Plaintiff also asserts a claim against Penn State for breach of contract (Count VII) and for declaratory judgment (Count VIII).

8.     Plaintiff seeks compensatory, consequential and punitive damages for the injuries she has suffered, including emotional, psychological and physical harm as well as damage and harm to her character and reputation. Plaintiff also seeks all lawfully recoverable attorneys' fees and costs incurred in the prosecution of this action, as well as all other legal and equitable relief to which she may be entitled.

9.    Plaintiff also seeks a declaratory judgment that the actions of Penn State breached the Agreement (as hereafter defined) to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement.

## THE PARTIES

10.    Plaintiff Rachel Lader is an adult individual and citizen of New York with an address of 141 Bristol Drive, Woodbury, NY 11797. Additionally, Rachel is a student entering her senior year of college at Penn State and will be applying to law schools later this academic year for admission in the Fall 2017.

11.    Defendant Marc A. Brownstein is an adult individual and citizen of Pennsylvania with an address of 1134 Youngs Ford Road, Gladwyne, PA 19035. Additionally, Marc A. Brownstein is the father of Defendant Molly R. Brownstein and the husband of Defendant Amy L. Brownstein.

12.    Defendant Amy L. Brownstein is an adult individual and citizen of Pennsylvania with an address of 1134 Youngs Ford Road, Gladwyne, PA 19035.  Amy L. Brownstein is the mother of Molly R. Brownstein ("Molly") and wife of Defendant Marc A. Brownstein.

13.    Defendant Molly is an adult individual and citizen of Pennsylvania with an address of 1134 Youngs Ford Road, Gladwyne, PA 19035. Additionally, Molly is a student enrolled at Penn State.

14.    Defendant Penn State is organized and existing under the law of the Commonwealth of Pennsylvania (the "Commonwealth"), was incorporated for educational purposes by the Act of February 22, 1855, PL 46, and has its principal administrative office located at 201 Old Main, University Park, Centre County, Pennsylvania 16802.

4

15.     Penn State also has and maintains campuses for its matriculating students throughout the Commonwealth, including many within this Judicial District.

16.     At all times relevant, Penn State acted under the color of state law, and has been the recipient of millions of dollars annually from the Commonwealth and the Federal government for use in funding its operations.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

18.     This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

19.     Venue in the Eastern District of Pennsylvania is proper under 28 U.S.C. §1391(b)(1) because the Brownsteins all reside in this Judicial District.

## FACTUAL BACKGROUND

I.     **Rachel and Molly's Semester Studying Abroad in Barcelona, Spain**

20.     Rachel and Molly are both members of the Alpha Sigma Alpha sorority at Penn State, and are currently set to share an apartment together with their sorority friends at Penn State this fall.

21.     This past spring, Rachel, Molly and some of their sorority friends decided to study abroad at the University of New Haven in Barcelona, Spain.

22.     Before they went to Spain, Rachel thought it would be a good idea to share an apartment in Barcelona with Molly.

23.     Soon after Rachel, Molly and their sorority sister friends began sharing an apartment, however, Rachel realized that living with Molly was a mistake.

24.     Rachel was instantly blindsided by Molly's lack of common courtesy and apparent inability to accept the responsibilities that came with sharing an apartment with other people.

25.     Rachel was unaware that she would be responsible for things like waking Molly up in the morning or ensuring that she promptly answered all of Molly's texts and calls.

26.     For example, while on a trip to Copenhagen, Denmark, Rachel, Molly and a group of their friends planned to go sightseeing.

27.     That morning, without telling Rachel or any of their friends, Molly decided instead to "sleep in."

28.     Understandably, rather than wait until 2:30 PM when Molly finally woke up, the girls decided to go ahead with their planned trip.

29.     Molly, however, expected Rachel and the other girls to wait for her to wake up, and when they did not, became enraged.

30.     Despite her own poor behavior and planning, Molly blamed Rachel for this incident and held it against her for the remainder of Molly's semester abroad.

31.     In fact, following that incident, Molly and her mother, Defendant Amy L. Brownstein, contacted Study Abroad Apartments, the apartment company from whom Rachel and Molly's apartment was rented, and requested to have Rachel "kicked out" of the apartment.

32.     However, Study Abroad Apartments likely understood that the incidents about which Amy L. Brownstein complained, were nothing more than minor disagreements between

roommates, which, appropriately, should be worked out between those two (2) roommates without outside interference.

33.     Therefore, Study Abroad Apartments denied Amy L. Brownstein's multiple requests to have Rachel moved and informed her that it was "not their job to mediate the situation."

34.     Still, both Molly and Amy L. Brownstein chastised and sought to hold Rachel accountable for doing normal things, typical of any college student, like playing music or having a friend over.

35.     For example, on one occasion, Molly all-of-a-sudden packed up and left Rachel alone in a hotel without saying a word.  Molly claimed that she left Rachel because one night earlier Rachel invited a family friend of hers back to their room since he had no place to stay, and could not get a room elsewhere.

36.     Contrary to the inappropriate accusations later made by the Brownsteins, Rachel asked Molly beforehand whether her friend could sleep on the couch and informed Molly that she had no intention to "hook up" with her family friend, which is a truth she also expressed to Penn State. *See, e.g.,* Text Messages Provided by Rachel Lader, attached hereto as **Exhibit A**.

37.     In or about early April 2016, Molly left Barcelona and ended her semester abroad.

## II.     **Penn State Contacts Rachel**

38.     Upon information and belief, the Brownsteins took advantage of the quid pro quo relationship they have with Penn State (a result of Marc A. Brownstein's large monetary donations to the university) to begin their campaign against Rachel *even before* Molly left Barcelona to go home.

39.     On or about March 9, 2016, Molly filed her complaint with Penn State.

40.     On March 14, 2016, Rachel received an email from Karen Feldbaum, the Associate Director of Penn State's Office of Student Conduct, suggesting that Rachel was being investigated for bullying Molly.

41.     Attached to Ms. Feldbaum's email on March 14, 2016, Rachel received a letter entitled "**NOTIFICATION OF ADMINISTRATIVE DIRECTIVE**" (the "Administrative Directive Letter"). *See* Administrative Directive Letter, attached hereto as **Exhibit B**. Ms. Feldbaum issued the Directive without seeking input from Rachel.

42.     Upon information and belief, as orchestrated by the Brownsteins, the Administrative Directive Letter was intended to intimidate and silence Rachel and make her feel as though she was presumed guilty. The Administrative Directive Letter stated, in part, as follows:

> This letter serves as formal notification that you are to have **no** contact--either directly or indirectly, in person, electronically, by telephone or any other medium, physical or verbal with Molly Brownstein. … A violation of this Administrative Directive is a violation of the student code of conduct and you may be subject to disciplinary action and sanctions including interim suspension, suspension, or expulsion from the University.

*Id.* (emphasis included in the original).

43.     Ms. Feldbaum issued the Administrative Directive Letter in violation of Penn State policy which limits use of the Administrative Directives to "serious circumstances."

44.     Following the Administrative Directive Letter, the Brownsteins and Penn State aggressively continued their collaborative and unwarranted investigation of Rachel.

45.     Upon information and belief, in late May 2016, the Brownsteins and Penn State intentionally and/or recklessly sought to cause Rachel emotional distress by calling and interrogating her on her 21st birthday while she was away on vacation with her family to discuss Molly's accusations against her.

8

46.     Specifically, Ms. Feldbaum called Rachel, and immediately put former Penn State Police Detective Spencer Peters on the phone to interview her and take her statements regarding Molly's accusations.

47.     Mr. Peters' primary role at Penn State is to investigate title IX sexual assault cases, and not to investigate minor disputes between roommates abroad.

48.     Both the Brownsteins and Penn State knew or should have known that using a former police detective to conduct an out-of-the-blue phone interrogation of Rachel on her 21st birthday while she was away with her family would cause her emotional distress, especially given Penn State's awareness of how important it was for Rachel to clear her name.

49.     As part of the interview, Mr. Peters asked Rachel to address an outrageously false and inappropriate accusation made by Molly, which further added to Rachel's stress and anxiety.

50.     Specifically, Mr. Peters, acting on behalf of the Brownsteins and Penn State, asked Rachel for her response to Molly's accusation that Rachel attempted to force Molly to watch Rachel and a male partner have sexual intercourse in a hotel room they shared in Prague.

51.     Mr. Peters also questioned Rachel about whether she had been sexually intimate with her family friend in the Prague hotel room. Mr. Peters' questions to Rachel about her intimate and private behavior were both inappropriate and unwarranted, as even an answer in the affirmative would not be a violation of Penn State policy.

52.     Molly's wildly inappropriate and false accusation, and Mr. Peters' interrogation embarrassed Rachel and caused her stress and anxiety, as diagnosed and documented during Rachel's subsequent appointments with her neurologist. *See, e.g.,* 6/17/2016 Letter from Dr. Allan Hausknecht, attached hereto as **Exhibit C**.

53.     Rachel's symptoms, which began shortly after she was notified of the Brownsteins and Penn State's Investigation, include, *inter alia*, debilitating migraine headaches, stress, anxiety, panic attacks and lapses in her ability to concentrate and focus on her LSAT preparations. *Id.*

54.     Rachel's symptoms continued to worsen with each action taken by the Brownsteins and Penn State in their aggressively pursued investigation of Rachel.

55.     On numerous occasions, Rachel reached out to Ms. Feldbaum by text to request that she stop communicating with Rachel directly and contact her lawyer because the investigation was having an increasingly detrimental effect on Rachel herself, as well as her ability to study for the LSATs.

56.     Penn State's repeated failures to accommodate Rachel's medical conditions by contacting Rachel, and not exclusively contacting her advisors, forced Rachel on June 8, 2016, to again request that Penn State accommodate her conditions and communicate directly with her attorney. *See* 6/8/2016 Emails Exchanged Between Rachel Lader and Ms. Feldbaum, attached hereto as **Exhibit D**.

57.     In her email to Ms. Feldbaum, Rachel again described how the investigation was affecting her and stated the following:

> You[r] investigation process has deeply troubled me … I am asking you to please respect my wishes and speak directly to my attorneys. … ***I've told you numerous times*** that I am trying to study for the law school entrance exam … . Your investigation … has caused me to take my eye off of my real goal which is to be a proud graduate of your university, and an attorney … .

*Id.* (emphasis supplied).

58.     Ignoring again Rachel's explicit plea that she not be contacted directly, Penn State continued to contact Rachel, directly aggravating her already-worsening medical conditions.

III.     **Defamatory Statements by the Brownsteins**

59.     As part of Penn State's investigation into Rachel and in support of the Brownsteins' efforts to have Rachel charged with harassment and subsequently removed from Penn State, Amy L. Brownstein submitted a report to Penn State's Office of Student Conduct entitled, "A Mother's Perspective," ("Amy L. Brownstein's Report") which was full of hearsay and defamatory statements that place Rachel in a false light. *See* Amy L. Brownstein's Report, attached hereto as **Exhibit E**.

60.     Amy L. Brownstein's Report, upon information and belief, was crafted, guided and orchestrated by the Brownsteins to create the impression among Penn State's Office of Student Conduct that Rachel was an abusive and intimidating bully who "does not embody the values" of Penn State, and therefore should be "dismissed immediately as a student." *Id.*

61.     Moreover, upon information and belief, the Brownsteins were aware when they submitted Amy L. Brownstein's Report that Rachel was planning to apply to law school after graduating from Penn State, and that the defamatory statements included in the report would cause harm to Rachel's reputation and record at Penn State.

62.     In Amy L. Brownstein's Report, the Brownsteins' statements suggest that Rachel is, *inter alia*, promiscuous, rude, vindictive and scary, and describe her as being an "expert bully, with a PhD in intimidation." *Id.* Falsely, the Brownsteins claim that "it is generally understood that you do not cross Rachel Lader—better to pretend to be her friend, then[sic] be her enemy." *Id.*

63.     Upon information and belief, Amy L. Brownstein's Report is nothing more than an eight-page attack on Rachel's character, littered with hearsay and false statements, intentionally meant to portray Rachel as the bad actor and Molly as the innocent victim, when

ironically Molly's mother (Defendant Amy L. Brownstein) specifically admitted that she was "sure [Molly] is not 100% innocent in all of this." *See* Rachel Lader's Request for the Dismissal of Charges, attached hereto as **Exhibit F**.

64.     As additional support for the Brownsteins' intentional crusade to have Rachel removed from Penn State, Molly provided her own "perspectives," which were similarly full of false and defamatory statements about Rachel attached to Amy L. Brownstein's Report. *See* **Exhibit E**.

65.     Molly's "perspectives" include several defamatory and false statements regarding Rachel's reputation and character. *See id.*

66.     For example, without offering any proof of her own, Molly stated that "Rachel has a terrible reputation," and further that Rachel "got in trouble in high school for bullying … ." *See id.*

67.     Upon information and belief, Molly's false and defamatory statement that Rachel had been "in trouble" for bullying before was intentionally meant to portray Rachel as someone who, criminally or otherwise, has been punished for bullying.

68.     Moreover, after falsely accusing Rachel of "making comments about other people's looks" and "acting as if she was better than them," Molly stated that those actions were "so typical of Rachel," and suggested that Rachel had a "horrible personality flaw." *See id.*

69.     Understanding the harm caused to her reputation by the Brownsteins' false and defamatory statements, Rachel sought to defend herself and her character by, among other things, writing an email to Spencer Peters, the investigator at Penn State, denying that there was any truth to the defamatory statements. *See* **Exhibit A**.

70.    In her email to Mr. Peters, Rachel not only denied the Brownsteins' defamatory accusations, but also expressed that she felt wronged by such accusations. *See id.*

71.    The Brownsteins' defamatory statements about Rachel simply have no truth to them, and were intentionally made to harm Rachel's reputation and manipulate Penn State into removing her as a student.

72.    The truth about Rachel stands in stark contrast to the Brownsteins' defamatory statements—Rachel is a thoughtful, kind, caring and impressive young woman who is widely respected by those who meet and know her. *See, e.g.,* 6/21/2016 Letter of Reference for Rachel Lader from Giovanni Durante, Ed.D., Principal of Syosset High School ("Mr. Durante's Letter of Reference"), attached hereto as **Exhibit G**.

73.    For example, in direct contrast to Molly's statement that "Rachel has a terrible reputation and got in trouble in high school for bullying," Rachel's former high school principal Giovanni Durante stated the following:

> Rachel Lader defines the acronym PRIDE, which is [Syosset High School's] Character Education Program: Patience, Respect, Integrity, Dignity and Empathy. In fact, Rachel was nominated to [Syosset High School's] PRIDE Wall, where [Syosset High School] highlight[s] students that demonstrated one of the attributes of PRIDE and **helped combat bullying**.

*Id.* (emphasis supplied).

74.    Additionally, in contrast to Molly's statement in her complaint that Rachel "comes with a bad history, lots of enemies, [and] not many friends," Mr. Durante's Letter of Reference included the following additional glowing words of praise for Rachel:

> Rachel Lader … was an exemplary student *both inside and outside* of the classroom. Rachel was respected by her peers and teachers alike and *did not pose any issues in our school or larger community*. In fact, Rachel was a true humanitarian that dedicated her bat mitzvah to raising money for a benefit named "Realizing the Dream," which is a nonprofit group that strives to continue the work of Dr. Martin Luther King Jr. …

> Rachel Lader is a respected member of our school community and I urge you to
> contact me … if you need additional information.

*Id.* (emphasis supplied).

75.     Upon information and belief, Molly's false statements regarding Rachel's past were intentionally and knowingly false, and part of the Brownsteins' campaign to defame Rachel.

**IV.     The Conclusion of Penn State's Investigation and Mr. Peters' Final Report**

76.     In addition to Amy L. Brownstein's Report and the statements provided by Rachel, Penn State interviewed three (3) witnesses, who, upon information and belief, were coached and/or influenced by the Brownsteins.

77.     Further, upon information and belief, the Brownsteins and Penn State orchestrated the final report issued by Mr. Peters ("Mr. Peters' Final Report") to include only some of the information gathered during the investigation, which heavily favored Molly's side of the story.

78.     For example, on May 6, 2016, Mr. Peters interviewed Danielle Chikkawswarmy, one of Molly's close friends. *See* Mr. Peters' Final Report, attached hereto as **Exhibit H**. Upon information and belief, prior to her interview, Molly openly asked Ms. Chikkawswarmy to lie about Rachel, and requested that she do so in order to have Rachel kicked out of school. *See, e.g.,* **Exhibit A**.

79.     Rachel suggested a witness to Mr. Peters who, upon information and belief, could have corroborated Ms. Chikkawswarmy's subsequent admission that Molly requested she lie about Rachel, yet Mr. Peters failed to even interview that witness, or include that information in his report.

14

80.    Instead, Mr. Peters' Final Report focused primarily on Molly's account of the events *despite her admissions* that her time in Barcelona was "really **just a blur**," and that "it was **difficult** [for Molly] **to recall exact details**." *See* **Exhibit H**.

81.    Moreover, as stated in Mr. Peters' Final Report, Molly "could not provide more specific examples of what was actually said to her [by Rachel]." *See id.*

82.    Importantly, Mr. Peters' Final Report only gave a passing reference to crucial statements made by Rachel.

83.    For example, Rachel stated that she had evidence in the form of text messages to refute Molly's accusations regarding Rachel's "intent to engage in intercourse," and to demonstrate Molly's awareness to the contrary. *Id.*

84.    Moreover, almost dismissively, Mr. Peters' Final Report adds that Rachel "did provide several texts that *she believes* support her position," but the report fails to provide any further analysis of that evidence. *Id.* (emphasis supplied).

85.    That Rachel's offering of actual evidence was given less weight than Molly's statements and admission that she had a difficult time "recall[ing] exact details," demonstrates the gross improprieties that occurred behind the scenes involving the Brownsteins and Penn State.

86.    Upon information and belief, Penn State's intentional and/or reckless decision not to conduct an impartial investigation of Molly's accusations was directly influenced and orchestrated by Marc A. Brownstein using his power as a large money Penn State donor.

87.    Moreover, Penn State's decision not to conduct an impartial investigation of Molly's accusations directly caused harm to Rachel by, *inter alia*, depriving her of her right to a fair investigation and to be treated equally.

V.   **Penn State's Impropriety and the Alternative Offer to Rachel**

88.   As further evidence of Penn State's impropriety in its actions regarding Rachel, upon information and belief, Penn State worked directly and exclusively with Marc A. Brownstein and Amy L. Brownstein, and even negotiated against Rachel on their behalf.

89.   Upon information and belief, Penn State's willingness to act on behalf of the Brownsteins and against Rachel, instead of acting impartially, was directly influenced by the large money donations made to Penn State by the Brownsteins.

90.   Penn State told Rachel's parents on multiple occasions that the school would not speak with them directly regarding Rachel's investigation and the surrounding process.

91.   Yet, despite that, Penn State openly admitted that it communicated on the weekend with Molly's family (*i.e.,* Marc A. Brownstein and Amy L. Brownstein) regarding the investigation, and that it even did so without involving Molly. Specifically, in an email to Rachel on June 6, 2016, Ms. Feldbaum stated that she had "been in touch with [Molly's] family over the weekend," and "[t]here may be some interest in a mediation," which she stated *even though* she had "**yet to speak with Molly directly**." *See* 6/6/2016 Email from Ms. Feldbaum to Rachel Lader, attached hereto as **Exhibit I** (emphasis supplied).

92.   Moreover, on June 8, 2016, Ms. Feldbaum emailed Rachel to offer her an "alternative to the conduct process" on behalf of the Brownsteins and Penn State. *See* **Exhibit D**.

93.   In her email, Ms. Feldbaum described this "alternative" as follows:

> If you (Rachel) are willing to move out of the apartment you are in with Molly for the fall and let Molly find someone else or take over your part of the lease, there will not be a conduct process or a mediation and this case will be finished.

*Id.*

94.     Importantly, Ms. Feldbaum's email also provided that "[t]here will be **no record** from a conduct perspective *which I know is one of your concerns*." *Id.* (emphasis supplied).

95.     Further, Penn State provided a short window of only one (1) day for Rachel to accept the offer, stating also that should Rachel decline, Ms. Feldbaum would "let Molly know and the likely next step [would] be the conduct process." *Id.*

96.     The impropriety of Penn State's "alternative" offer made to Rachel is astounding, yet not surprising given the Brownsteins' involvement.

97.     Upon information and belief, instead of independently conducting an impartial and fair investigation, Penn State knowingly consulted with the Brownsteins, to Rachel's detriment, and purposely departed from its standard procedures by making an offer with the best interests of the Brownsteins in mind, rather than the interests of the university and its students.

98.     Moreover, upon information and belief, the Brownsteins and Penn State intended to use the offer to extort Rachel's agreement to move out of the apartment shared with Molly.

99.     In that way, Penn State's offer on behalf of the Brownsteins operated as a threat to Rachel that if she did not accept Penn State's offer, there could in fact be a record of a conduct violation available to those law schools which Rachel planned to apply.

100.    Although Penn State's Code of Conduct lays out several types of sanctions, the Code does not provide for any mechanism to use the Office of Student Conduct's process to effectuate a student's off campus roommate preferences. It is unprecedented therefore, that Penn State would negotiate on behalf of Molly against Rachel and use their off campus living arrangement as a bargaining chip.

101.    This willingness of Penn State to acquiesce to the inappropriate and harmful demands of a large money donor shocks the conscience.

102.     Similarly, the extent to which Marc A. Brownstein is willing to pervert his power and influence as a large money Penn State donor for the purpose of intentionally harming Rachel is equally disturbing.

103.     When Rachel decided not to accept Ms. Feldbaum's "plea deal," she received notification from the Penn State Office of Student Conduct that she had been formally charged with Harassment (Charge Code 03.99); a violation of the Student Code of Conduct. *See* Student Conference Summary Form for Rachel Lader, attached hereto as **Exhibit J**.

104.     Despite the Brownsteins and Penn State's inappropriate and unlawful actions, Rachel attempted to amicably resolve this matter by requesting mediation.

105.     The Brownsteins and Penn State surprisingly declined Rachel's offer. In an email from Ms. Feldbaum on June 15, 2016, she stated, "I have been in touch with Molly and she was not interested in the alternative options provided." 6/15/2016 Email from Ms. Feldbaum to Andrew Shubin, attached hereto as **Exhibit K**.

106.     Upon discussing her remaining options with her attorneys, Rachel concluded that contesting the Harassment charge and requesting a hearing provided the only opportunity for Rachel to clear her name and record of the charge, and, most importantly, to protect herself from increased potential disciplinary exposure should the Brownsteins make additional false accusations to achieve their goal of having Rachel removed from Penn State, or at the very least from the apartment Rachel and Molly rented together for this fall.

**VI.**     **The Agreement and Penn State's Subsequent Breach**

107.     At this point, Penn State's aggressive campaign against Rachel, on behalf of the Brownsteins, had already caused Rachel to suffer, *inter alia,* debilitating migraine headaches,

stress, anxiety, panic attacks and lapses in her ability to concentrate and focus on her LSAT

preparations. *See* **Exhibit C**.

108.   In fact, in support of her medical conditions, Rachel's doctor wrote a letter in

which he acknowledged her serious condition and noted the following:

> Rachel's distress is caused by Penn State's Office of Student Conduct['s]
> decision to investigate her, their questions to her about intimate sexual issues,
> and their recommendation that she be disciplined … [as well as by] Rachel's
> perception that the University is targeting her for discipline only because the
> accuser's father has significant power and influence at the University and
> because he wants Rachel to move out of an apartment she is slated to share with
> his daughter in the Fall.

*Id.*

109.   In order avoid further harm and aggravation of her symptoms, Rachel adjusted her

focus to finding a solution that would quickly bring this matter to an end.

110.   Importantly, Rachel clearly and consistently conveyed to Penn State that she

would **only agree** to resolve this matter if Penn State guaranteed that the resolution, and any

details of the resolution, would not be disclosed. *See, e.g.,* 6/23/2016 Emails Exchanged Between

Andrew Shubin and Danny Shaha, attached hereto as **Exhibit L**.

111.   Specifically, on June 23, 2016, Rachel's Advisor Andrew Shubin emailed Danny

Shaha of Penn State's Office of Student Conduct, seeking assurances from Penn State regarding

the confidentiality and protection from disclosure of any resolution agreed to by Rachel. Mr.

Shubin's email stated as follows:

> Can you confirm that the details of Ms. Lader's resolution are confidential and
> covered by [the Family Educational Rights and Privacy Act] ("FERPA") — and
> would not be shared with the accuser? Also any application or approval of
> external nondisclosure would not shared?

*Id.*

19

112.    In response, Mr. Shaha stated "Correct on both. Since this is not title IX nor a crime of violence, the specifics of the sanction **would not be shared with the other party**. And they have **no right to know** about external nondisclosure." *Id.* (emphasis supplied).

113.    Moreover, both Rachel and Mr. Shubin reiterated to Mr. Shaha that Rachel would only agree to a resolution if Penn State guaranteed not to disclose the existence or details of such resolution.

114.    Thereafter, Rachel and Penn State reached an agreement, in which Rachel agreed she would sign the resolution and accept one semester of disciplinary probation *in exchange for* Penn State's guarantee that the resolution and any details of the resolution would not be disclosed (the "Agreement"). *See, e.g.,* 6/27/2016 Letter from Andrew Shubin to Danny Shaha, attached hereto as **Exhibit M**.

115.    On July 7, 2016, Rachel and Mr. Shubin met with Mr. Shaha to, among other things, confirm the details of the Agreement.

116.    During that meeting Mr. Shaha stated that he believed the Brownsteins were aware that Rachel had signed the resolution and that she had been placed on probation.  Rachel immediately protested stating that the she had only signed the resolution based upon Penn State's promise and assurance that the resolution would be kept confidential.

117.    Upon information and belief, *almost immediately* after Rachel signed the resolution, Penn State disclosed the resolution and its terms to the Brownsteins in clear violation and breach of the Agreement and in violation of FERPA.

118.    Only *twenty minutes* after the meeting ended, Rachel received an email from Kathy Moore, the Rental Supervisor of Rachel and Molly's apartment for this fall, which

demonstrated her awareness that Rachel signed the resolution. *See* 7/7/2016 Email from Kathy Moore, attached hereto as **Exhibit N**.

119.   Upon information and belief, the Brownsteins disclosed that Rachel signed the resolution to Ms. Moore as part of their continued efforts to secure Rachel's removal from the apartment and embarrass her.

120.   Penn State's disclosure of the terms of the Agreement caused severe emotional distress to Rachel. In fact, upon her discovery of Penn State's disclosure and breach of the Agreement, Rachel began shaking and trembling, as she was overtaken with emotion and ultimately shocked at how Penn State misled her into signing the resolution.

121.   Marc A. Brownstein acted in furtherance of the efforts against Rachel when on July 14, 2016, he sent an email to Rachel, Molly, their roommates, Ms. Moore and others, intentionally and maliciously stating as follows:

> Rachel has recently been convicted of Harassment, and sanctioned with a level of University Probation by the Office of Student Conduct at Penn State University, for bullying actions taken against Molly during their time in Barcelona. Molly & Rachel were roommates there.

7/14/2016 Email from Marc A. Brownstein, attached hereto as **Exhibit O**.

122.   Upon information and belief, Marc A. Brownstein intended to and did in fact embarrass, humiliate and cause severe emotional distress to Rachel by sending his defamatory email on July 14th. In fact, Marc A. Brownstein continues to intentionally harm and defame Rachel by, among other things, calling the parents of her and Molly's friends and offering to pay for each of their daughter's rents if they leave Rachel alone and live with Molly.

123.   The injuries and severe emotional distress caused by the Brownsteins and Penn State have continued to affect Rachel, even to this day.

124.    In fact, as Penn State is aware, Rachel she was recently hospitalized, from July 25th through July 28th, for the diagnosis of colitis, brought on by the stress and anxiety from which she still suffers.

125.    Rachel is therefore still under treatment with her neurologist, who has expressed concern that she could suffer long-term psychological and psychiatric harm.

126.    Rachel has sought resolution with Penn State over this matter as recently as August 8, 2016, which, Penn State denied. Rachel is therefore left with no other option but to seek a remedy for her continued injuries by asking that this Court intervene.

## COUNT I – DEFAMATION/DEFAMATION PER SE

**(Against Marc A. Brownstein, Amy L. Brownstein and Molly R. Brownstein)**

127.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

128.    In or around late May 2016, the Brownsteins, intending to injure Rachel and deprive her of her good name and reputation, falsely, maliciously, and wickedly submitted Amy L. Brownstein's Report, identifying Rachel by her first and last name, to Penn State's Office of Student Conduct.

129.    In Amy L. Brownstein's Report, intending to injure Rachel and deprive her of her good name and reputation, Amy L. Brownstein falsely, maliciously, and wickedly stated the following:

- "Once back in Barcelona, Rachel stepped up her bullying efforts … ."

- When Molly was showering, Rachel would purposely take the electricity card out of the holder … so Molly would be in the pitch dark while showering … All bullying tactics."

- "[I]t is generally understood that you do not cross Rachel Lader—better to pretend to be her friend, then[sic] be her enemy. … The other girls were

frankly scared of Rachel. This was common knowledge the among sorority sisters."

- "This was all mental bullying … [which has] been proven to lead to dire outcomes with teenagers. And Rachel revealed herself to be an expert bully, with a PhD in intimidation."

- "By now, Molly had no fight left in her—the emotional abuse was so unrelenting."

- "[Rachel] … turned out to be a monster."

- "As [Marc A. Brownstein] says, Rachel clearly does not embody the values of this great university."

130.    The statements made by the Brownsteins in Amy L. Brownstein's Report intended to, and in fact, did convey to Penn State's Office of Student Conduct, either expressly or by implication, the defamatory and slanderous imputation that Rachel was a dangerous and intimidating bully, who used her "bullying tactics" to abuse Molly, and who physically threatened Molly's safety and wellbeing.

131.    Moreover, the statements made by the Brownsteins in Amy L. Brownstein's Report intended to, and in fact, did convey to Penn State's Office of Student Conduct, either expressly or by implication, the defamatory and slanderous imputation that Rachel has engaged in, and been found guilty of, bullying in the past.

132.    By these publications, the Brownsteins' statements are also actionable as Defamation per se.

133.    The statements and charges in Amy L. Brownstein's Report, and identified in the foregoing paragraphs of this Complaint are false, and the Brownsteins knew or should have known that they were false at the time of the publications.

134.    Rachel has never at any time engaged in or been guilty of bullying, or any of the other crimes, acts and other defamatory statements in the preceding paragraphs, but rather has

23

been respected and honored for her acts to help combat bullying, and is otherwise known as an "exemplary student both inside and outside of the classroom."

135.    The Brownsteins knew or should have known that the statements and charges contained in Amy L. Brownstein's Report, and identified in the foregoing paragraphs of this Complaint, were false when made, and the Brownsteins published them either intentionally and maliciously, or with reckless disregard for their truth or falsity.

136.    The statements and charges included in Amy L. Brownstein's Report, and contained in the foregoing paragraphs of this Complaint, were printed, published and circulated by the Brownsteins in or around late May 2016, and were widely read by Penn State's employees, Rachel's family and diverse other persons.

137.    The Brownsteins' statements were not privileged under Pennsylvania law (or any law).

138.    By reason of Brownsteins' publication and circulation of the statements and charges included in Amy L. Brownstein's Report, and contained in the foregoing paragraphs of this Complaint, Rachel has been brought into scandal and reproach, and is suspected to have engaged in or be guilty of bullying and the other crimes and acts which the Brownsteins' statements imputed to Rachel, as a result of which Rachel has suffered, and continues to suffer, severe personal injuries including, but not limited to, debilitating migraine headaches, stress, anxiety, panic attacks, lapses in her ability to concentrate and focus on her LSAT preparations, irreparable damage to her reputation, great financial loss and great humiliation.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein and Molly R. Brownstein, and award Plaintiff compensatory damages, plus any

allowable attorneys' fees, interest, costs, punitive damages, and such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a declaratory judgment that the actions of Penn State breached the Agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT II – FALSE LIGHT

**(Against Marc A. Brownstein, Amy L. Brownstein and Molly R. Brownstein)**

139.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

140.    The Brownsteins' reckless statements that Rachel "stepped up her bullying efforts," used "bullying tactics," engaged in "mental bullying" and "unrelenting" "emotional abuse," was "an expert bully, with a PhD in intimidation" and a "monster," and had "a terrible reputation and got in trouble in high school for bullying as well," impugned Rachel's professional and personal integrity and placed her in a false light.

141.    The false and defamatory statements identified in the foregoing paragraphs of this Complaint were publicized by the Brownsteins.

142.    The Brownsteins had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Rachel would be placed.

143.    The false light in which the Brownsteins portrayed Rachel would be highly offensive to a reasonable person, in that the suggestion was that Rachel was a dangerous and intimidating bully, who used her "bullying tactics" to abuse Molly, and who physically threatened Molly's safety and wellbeing.

144.    As a result of the Brownsteins' actions, Rachel has suffered, and continues to suffer, severe personal injuries including, but not limited to, debilitating migraine headaches, stress, anxiety, panic attacks, lapses in her ability to concentrate and focus on her LSAT preparations, irreparable damage to her reputation, great financial loss and great humiliation.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein and Molly R. Brownstein, and award Plaintiff compensatory damages, plus any allowable attorneys' fees, interest, costs, punitive damages, and such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a declaratory judgment that the actions of Penn State breached the Agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT III - INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

145.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

146.    Defendants' conduct, as set forth in the foregoing paragraphs of this Complaint, was so outrageous in character and so extreme in degree as to fall outside the bounds of decency, and is to be regarded as intolerable in the community.

147.    At all times relevant hereto, Defendants knew with substantial certainty, or should have known that severe emotional distress would be produced by their conduct.

148.   By engaging in the acts set forth in the foregoing paragraphs of this Complaint, Defendants engaged in extreme and outrageous conduct, and intentionally and recklessly inflicted severe emotional distress upon Plaintiff.

149.   By engaging in the acts set forth in the foregoing paragraphs of this Complaint, Defendants exploited and abused their relationships with Rachel, including the Brownsteins and Molly with Rachel as roommates, sorority sisters and friends, and Penn State as an academic institution with Rachel, a member of Penn State's student body. Defendants further violated Rachel's trust and her right to be treated equally as a Penn State student, and caused Rachel great distress.

150.   As a direct and proximate result of the acts of Defendants as set forth in the foregoing paragraphs of this Complaint, Plaintiff has required and continues to require medicine, medical, psychological and other treatment in order to manage and cure herself of the injuries she sustained; has been, and continues to be obliged to expend various sums of money for such medical care and treatment.

151.   As further direct and proximate result of the acts of the Defendants as set forth in the foregoing paragraphs of this Complaint, Rachel has suffered and continues to suffer severe emotional distress, debilitating migraine headaches, stress, anxiety, panic attacks, lapses in her ability to concentrate and focus on her LSAT preparations, irreparable damage to her reputation, great financial loss and great humiliation.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein, Molly R. Brownstein and The Pennsylvania State University, and award Plaintiff compensatory damages, plus any allowable attorneys' fees, interest, costs, punitive damages, and

such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a declaratory judgment that the actions of Penn State breached the Agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT IV - NEGLIGENT
## INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

152.     Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

153.     Defendants, through their actions and omissions, inflicted severe emotional distress upon the Plaintiff and in a negligent manner.

154.     Defendants owed a duty of care to Rachel as a foreseeable plaintiff.

155.     As a student at Penn State, who was the subject of an investigation by Penn State, and who informed Penn State of the injuries both it and the Brownsteins, acting together, were continuing to cause to her, Rachel was a foreseeable plaintiff.

156.     Moreover, the risk of harm to Rachel was reasonably foreseeable to the Brownsteins and Penn State, acting together.

157.     Rachel informed Penn State on numerous occasions between late May 2016 and the present, that its actions throughout the investigation were causing Rachel serious medical injuries.

158.     Upon information and belief, Penn State communicated this and other information to the Brownsteins throughout the investigation.

159.   Accordingly, the risk of harm to Rachel was reasonably foreseeable to Defendants.

160.   Defendants breached their duty of care for all the reasons set forth in the paragraphs of this Complaint.

161.   Defendants should have realized that their conduct involved an unreasonable risk of causing distress, and from the facts known to them, individually or together, Defendants should have realized that the distress, if it were caused, might result in bodily harm.

162.   The negligent acts and omissions of the Defendants caused and continue to cause Rachel's severe emotional distress. Defendants' actions throughout the investigation and afterwards, have led to Rachel's re-occurring debilitating migraine headaches, stress, anxiety, panic attacks, lapses in her ability to concentrate and focus on her LSAT preparations, irreparable damage to her reputation, great financial loss and great humiliation.

163.   Rachel's doctor has acknowledged in a letter to Penn State that its actions have caused, among other things, Rachel's distress and have led to the need to take medication for her stress and anxiety. In fact, due to the continued worsening of Rachel's conditions, she was recently hospitalized, from July 25th through July 28th.

164.   As a direct and proximate result of the aforesaid acts of Defendants, Plaintiff has suffered injuries, and sustained additional losses, as set forth above, and continues to do so.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein, Molly R. Brownstein and The Pennsylvania State University, and award Plaintiff compensatory damages, plus any allowable attorneys' fees, interest, costs, and such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a

declaratory judgment that the actions of Penn State breached the Agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT V – PRIMA FACIE TORT – RESTATEMENT (SECOND) § 870

### (Against All Defendants)

165.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

166.    Through the Brownsteins' false and defamatory statements published in Amy L. Brownstein's Report and submitted to Penn State, through Defendants' intentional infliction of emotional distress, and through the Brownsteins' use of large donations made to Penn State as a quid pro quo in return for Penn State's cooperation in the unwarranted and inappropriate campaign to remove Rachel from the school or charge her with a conduct violation, Defendants have intentionally caused injury to Rachel.  The conduct of the Brownsteins in defaming Rachel, as well as the conduct of Defendants in inflicting emotional distress on Rachel is culpable and has no lawful justification.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein, Molly R. Brownstein and the Pennsylvania State University, and award Plaintiff compensatory damages, plus any allowable attorneys' fees, interest, costs, punitive damages, and such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a declaratory judgment that the actions of Penn State breached the Agreement to

keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT VI – CIVIL CONSPIRACY

### (Against All Defendants)

167.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

168.    As set forth above, Defendants engaged in a course of conduct intended to defame Rachel and cause severe emotional distress, stress, anxiety, panic attacks, lapses in her ability to concentrate, irreparable damage to her reputation, great financial loss and great humiliation to Rachel.

169.    Defendants conspired against Rachel, in that first, the Brownsteins used their power and influence as big money donors to Penn State to induce Penn State's commencement of an unprecedented, unwarranted and inappropriate investigation of Rachel; second, the Brownsteins crafted Amy L. Brownstein's Report, an eight-page attack on Rachel submitted to Penn State full of false and defamatory statements that called for Rachel's dismissal from Penn State; and third, Defendants concluded their inappropriately-conducted and cooperative investigation of Rachel, sought to extort Rachel's agreement to move out of the apartment she shared with Molly and subsequently breached Penn State's confidentiality agreement with Rachel.

170.    As a result of the conspiracy formulated and perpetrated by Defendants, Rachel has sustained substantial damages.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendants Marc A. Brownstein, Amy L. Brownstein, Molly R. Brownstein and the Pennsylvania State University, and award Plaintiff compensatory damages, plus any allowable attorneys' fees, interest, costs, punitive damages, and such other additional relief as this Court deems just and proper. Plaintiff also requests that this Court enter a declaratory judgment that the actions of Penn State breached the Agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement with Plaintiff.

## COUNT VII – BREACH OF CONTRACT

### (Against Defendant Penn State)

171.    Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

172.    Prior to reaching a resolution with Penn State, Rachel communicated to Penn State, both by email and in person, that it was her intent to only enter into an agreement if Penn State explicitly agreed not to disclose the existence or details of such resolution.

173.    Each time, in response, Penn State assured "the specifics" of the resolution "**would not be shared** … ."

174.    In fact, on June 27, 2016, counsel for Rachel wrote to Penn State's Danny Shaha, stating "I write to thank you for … confirming the confidentiality of the [resolution] and external nondisclosure process."

175.   Penn State's guarantee to keep the resolution and any of its details confidential *in exchange for* Rachel's agreement to sign and accept the terms of the resolution, constitute offer, acceptance and consideration sufficient to form a contract between Penn State and Rachel.

176.   On or about July 7, 2016, Mr. Shaha of Penn State disclosed that Rachel signed the resolution, as well as the details of the resolution, to Ms. Feldbaum who in turn disclosed that information to the Brownsteins and Kathy Moore, Rental Supervisor of Rachel and Molly's apartment.

177.   Penn State's blatant and intentional disclosure of the resolution and resolution details, in violation of the terms of the agreement, constituted a breach of contract.

178.   As a direct result of Penn State's actions, Rachel has suffered, and continues to suffer, severe personal injuries including, but not limited to, debilitating migraine headaches, stress, anxiety, panic attacks, lapses in her ability to concentrate and focus on her LSAT preparations, irreparable damage to her reputation, great financial loss and great humiliation.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter judgment in her favor and against Defendant the Pennsylvania State University, and award Plaintiff compensatory and consequential damages, plus any allowable attorneys' fees, interest, costs, and such other additional relief as this Court deems just and proper.

## COUNT VIII – DECLARATORY JUDGMENT

### (Against Defendant Penn State)

179.   Plaintiff Rachel incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

33

180.    Pursuant to 28 U.S. Code § 2201, Plaintiff Rachel seeks a declaratory judgment declaring that the actions of Penn State, as set forth in the foregoing paragraphs of this Complaint, breached the agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant the vacation of that Agreement.

181.    Penn State materially breached the Agreement between Rachel and Penn State by disclosing that Rachel signed the resolution, as well as the details of the resolution, to the Brownsteins.

182.    As a result of Penn State's material breach, Penn State has forfeited its rights under the Agreement.

183.    Therefore, Plaintiff Rachel is entitled to a declaration that the actions of Penn State breached the agreement to keep confidential the resolution, as well as the details and terms of the resolution, and warrant vacation of that Agreement.

**WHEREFORE**, Plaintiff Rachel K. Lader respectfully requests that this Honorable Court enter a declaratory judgment in her favor and against Defendant the Pennsylvania State University holding that the Pennsylvania State University: 1) materially breached the resolution and related agreement; and 2) violated its obligations of confidentiality upon which it induced the execution of the resolution and agreement by the Plaintiff and, as such, the Court finds sufficient cause to vacate the resolution and related agreement and declare them a nullity, and

awards Plaintiff such other additional relief as this Court deems just and proper.

Respectfully submitted,

MITTS LAW, LLC

By: _____
Maurice R. Mitts, Esquire
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0112 (office)
(215) 866-0113 (facsimile)
mmitts@mittslaw.com

**MCLAUGHLIN & STERN LLP**

Steven J. Hyman, Esquire
Alan E. Sash, Esquire
260 Madison Avenue
New York, NY 10016
(212) 448-1100 (office)
(212) 448-0066 (facsimile)
shyman@mclaughlinstern.com
asash@mclaughlinstern.com
(pro hac vice application forthcoming)

**ATTORNEYS FOR PLAINTIFF
RACHEL K. LADER**

Dated:   August 15, 2016

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Rachel K. Lader,
141 Bristol Drive
Woodbury, NY 11797,

      Plaintiff,

v.

Marc A. Brownstein,
1134 Youngs Ford Road
Gladwyne, PA 19035,

      And

Amy L. Brownstein,
1134 Youngs Ford Road
Gladwyne, PA 19035

      And

Molly R. Brownstein,
1134 Youngs Ford Road
Gladwyne, PA 19035

      And

The Pennsylvania State University,
201 Old Main
University Park, PA 16802,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

No. _____

**JURY TRIAL DEMANDED**

## EXHIBIT INDEX

| EXH. | DATE | DOCUMENT |
|------|------|----------|
| A | Undated | Text Messages Provided by Rachel Lader |
| B | 3/14/2016 | Administrative Directive Letter |
| C | 6/17/2016 | Letter from Dr. Allan Hausknecht |
| D | 6/8/2016 | Emails Exchanged Between Rachel Lader and Ms. Feldbaum |
| E | Undated | Amy L. Brownstein's Report |
| F | Undated | Rachel Lader's Request for the Dismissal of Charges |
| G | 6/21/2016 | Mr. Durante's Letter of Reference |

| H | Undated | Mr. Peters' Final Report |
| I | 6/6/2016 | Email from Ms. Feldbaum to Rachel Lader |
| J | Undated | Student Conference Summary Form for Rachel Lader |
| K | 6/15/2016 | Email from Ms. Feldbaum to Andrew Shubin |
| L | 6/23/2016 | Emails Exchanged Between Andrew Shubin and Danny Shaha |
| M | 6/27/2016 | Letter from Andrew Shubin to Danny Shaha |
| N | 7/7/2016 | Email from Kathy Moore |
| O | 7/14/2016 | Email from Marc A. Brownstein |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT A

Text Messages Provided by Rachel Lader

INFORMATION PROVIDED BY RACHEL

Zimbra                                                                              Page 1 of 4

Zimbra                                                                    sjp141@psu.edu

**Follow up**

From : Rachel Lader <rachellx17@aol.com>                    Fri, May 20, 2016 11:56 AM
Subject : Follow up                                                      @2 attachments
        To : sjp141@psu.edu

Hi Spencer,

Here's a follow up from one of the kids who was with me one of the last nights in Barcelona, who heard
Danielle talking about the incident, and it just proves that they're both liars. I did nothing to either of
them for them to lie about me like this. I guess that's what they call jealousy. And by the way, my
parents brought me up to always be a lady, and that story about me being with somebody in a sexual
manner is highly inappropriate, a flat out lie, blatantly disgusting, and proved by a text I sent you. And
again, that young man was in my kindergarten class, I graduated public school, middle school, and high
school with him, and is in a fraternity in college that my brother helped put him in to. We've been friends
for seventeen years, and that's all we've been for seventeen years. I take friendships very seriously, and I
will always help a friend in need. Frankly, I think apologies are in order from Molly to me, not the other
way around, and I expect an apology. Also, if penn state is really truly looking at the conduct of their
students, I would like you to formally open up an investigation in Molly's conduct, and what she has done
to both my reputation, and my standing with my sorority sisters. When you start that investigation, let me
know. Thank you.



●●●○○ AT&T 📶            **11:49 AM**            ⌁ 🕐 ✳ 99% ▇

‹ Messages            **Brandon**            Details

Wow Rachel

I can't believe what you just told
me about the situation

Especially since Danielle was
the one who came over to you
and me one of the last nights
out in Barcelona and flat out
said "Molly told me to lie to penn
state about you bullying her, so
that she could try and get you

that she could try and get you kicked out of school". We always knew both Danielle and Molly had issues, but for Danielle to lie



Especially since Danielle was the one who came over to you and me one of the last nights out in Barcelona and flat out said "Molly told me to lie to penn



state about you bullying her, so that she could try and get you kicked out of school". We always knew both Danielle and Molly had issues, but for Danielle to lie like that blows my mind. I'm sorry you considered either of them your friend.

Best,
Rachel Lader

**image3.PNG**
165 KB

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT B

## Administrative Directive Letter

## (dated March 14, 2016)

PENNSTATE



STUDENT AFFAIRS
Office of Student Conduct

The Pennsylvania State University
120 Boucke Building
University Park, PA 16802-1503

Telephone:  (814) 863-0342
Fax Number:  (814) 863-2463

March 14, 2016

Rachel Lader
208 Ewing Hall
University Park, PA 16802
PROVIDED VIA E-MAIL

**RE:    NOTIFICATION OF ADMINISTRATIVE DIRECTIVE**

Dear Rachel,

This letter serves as formal notification that you are to have **no** contact--either directly or indirectly, in person, electronically, by telephone or any other medium, physical or verbal with Molly Brownstein.  In addition, you may not post any remarks regarding Molly on any social network(s) including but not limited to, Facebook, Myspace, Twitter, or any other electronic network.  Please realize that indirect contact includes friends and acquaintances contacting Molly on your behalf.

Rachel, please be advised that the directive goes into effect **immediately**.  So although you are currently in Barcelona, the directive is considered to be in place and will remain until you graduate from Penn State.

A violation of this Administrative Directive is a violation of the student code of conduct and you may be subject to disciplinary action and sanctions including interim suspension, suspension, or expulsion from the University.

Rachel, I would be happy to talk you over the phone regarding the directive.  If you would provide your cell phone number, I'm happy to call you.  Also, you are encouraged to send any questions you have via e-mail.

Sincerely,

Karen Feldbaum
Associate Director

cc: Student File

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT C

Letter from Dr. Allan Hausknecht

(dated June 17, 2016)



**ALLAN HAUSKNECHT, M.D.**

**DIPLOMATE NEUROLOGY & PSYCHIATRY**

**301 FRANKLIN AVENUE**

**HEWLETT, NEW YORK  11557**

**516-374-2992**

**FAX 516-295-9364**

June 17, 2016

Andrew  J. Shubin, Attorney at Law, P.C.

333 South Allen Street

State College, PA.  16801

To whom it may concern:

RE:  RACHEL LADER

Rachel today is being treated at this office for "stress", "anxiety", and inability to concentrate.  She has also been experiencing "panic attack" like symptoms.  These symptoms are interfering significantly with ability to focus on her LSAT class and test preparation.

These problems arose between her and her study abroad roommate (and former friend )while they were students in Europe and are trivial in nature.  Rachel's distress is caused by Penn State's Office of Student Conduct decision to investigate her, their questions to her about intimate sexual issues, and their recommendation that she be disciplined.  She has never been in trouble before.

These complaints have caused a serious condition in Rachel and distress related to her perception that the University is targeting her for discipline only because the accuser's father has significant power and influence at the University and because he wants Rachel to move out of an apartment she is slated to share with his daughter in the Fall.  Rachel, in fact, pointed out that the University told her if she leaves the apartment they will drop the disciplinary matter.  Rachel feels that Penn State will not give her a fair hearing or process because of the accuser's father's "power", wealth and Penn State connections, and she feels betrayed by her University.

Yours truly,

Allan Hausknecht, M.D.

Diplomate, American Board of Psychiatry & Neurology

Diplomate, American Board of Quality Assurance & Utilization Review Physicians

Fellow, American College of Medical Quality

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT D

Emails Exchanged Between Rachel Lader
and Ms. Feldbaum

(dated June 8, 2016)

**From:** Rachel Lader <rachellx17@aol.com>
**Date:** June 8, 2016 at 1:03:50 PM EDT
**To:** KAREN FELDBAUM <kxf6@psu.edu>
**Subject: Re: Update and Opportunity**

Karen,

As you know I have attorneys, it is my constitutional privilege to have you address all of these emails and texts to them. You're investigation process has deeply troubled me. I will advise my lawyers of your offer, either I or my lawyers will get back to you. I am asking you to please respect my wishes and speak directly to my attorneys. My attorneys name is Ronald Russo, his telephone number is 212-344-5400 , he is a former US attorney, and certainly knows the law better than I. Thank you for trying to resolve this, but respectfully I must seek my attorneys opinion.  Just one last thought, I've told you numerous times I am trying to study for the law school entrance exam being given in September. Your investigation, which is totally frivolous, has caused me to take my eye off of my real goal which is to be a proud graduate of your university, and an attorney able to practice law in the state of New York.

Best,
Rachel Lader

Sent from my iPhone

On Jun 8, 2016, at 12:53 PM, KAREN FELDBAUM <kxf6@psu.edu> wrote:

Hello Rachel,

I have been asked to provide you with an alternative to the conduct process.  If you are willing to move out of the apartment you are in with Molly for the fall and let Molly find someone else or take over your part of the lease, there will not be a conduct process or a mediation and this case will be finished. There will be no record from a conduct perspective which I know is one of your concerns.

If you do not wish to take this option then I will let Molly know and the likely next step will be the conduct process.

Please let me know your thoughts by the end of the day tomorrow, Thursday, June 9th.

Thanks so much.

Karen

--
Karen Feldbaum
Associate Director, Office of Student Conduct
120 Boucke Building

University Park, PA  16802
814-863-0342
http://studentaffairs.psu.edu/conduct

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT E

# Amy L. Brownstein's Report

FINAL REPORT SUBMITTED BY MOLLY AND HER MOTHER

The stories you are about to hear are further details of what happened in Europe this past semester between Molly Brownstein & Rachel Lader. These stories and anecdotes will be told in chronological order, to give Penn State's Department of Student Conduct a more comprehensive understanding of what actually took place.

We are telling it both from a Mother's Perspective (Amy Brownstein) and from the daughter/victim (Molly Brownstein).

## A Mother's Perspective:

It all started in Copenhagen. That was the second weekend the girls were abroad. Molly, Rachael, and the other roommate, Alisa Chait, all shared a room.

The girls discussed taking a tour. Molly was exhausted and told the girls she didn't want to go on a tour too early. When she woke up the girls were gone, she texted both Rachel & Alisa to meet up, but they never responded. She kept texting them all day. Still no response. They ignored all her texts. Helluva way to start a semester away with friends.

Molly was so upset that she went and got a room in another hotel and toured Copenhagen by herself. When she saw them at the airport to fly back to Barcelona, Rachel & Alisa ignored her. All because she didn't want to take an early tour.

Back at the apartment, the girls started talking to her and all was seemingly fine--until the next week, when Rachael stopped talking to her once again, and starting ignoring everything.

I told Molly to talk to Rachel and ask what is wrong. Rachel claimed she will start talking to Molly if she takes her to London with her to stay at Molly's friends apartment. Molly didn't want to take her, but I encouraged her to do it, so she can keep peace in the apartment. They went to London, and Molly said Rachel was difficult the whole weekend--complaining about the apartment they were staying in, complaining that her friends' roommates were ugly—nasty, petty things that Molly thought was so rude.

But you start to get a picture of what kind of human being Rachel is.

The following week, Molly had plans to go to Prague with her high school friends. Rachel asked Molly if she would her, and not Molly's high school friends, and split the cost of a room with her because she had no one to stay with. Molly, being the nice one, left her high school friends and split a room with Rachael—again, just to keep peace.

Rachel ran into a guy in Prague the first night out that she knew from home, and told Molly she was bringing him back to the room to 'hookup.' Molly told her to go to his room because their room was all open  without walls, and Molly was in her pajamas, ready for bed. Rachel ignored Molly's plea and walked in the hotel room with the guy. Rachel didn't care that Molly was in the room. Now in an incredibly awkward situation, Molly, had to leave and go to her high school friends' hotel room to stay. Rachel claimed Molly abandoned her in Prague, never apologized to Molly, and never texted her the rest of the weekend.


In Prague, Molly stayed with her high school friends the rest of the weekend. And when she went back to the hotel room she shared with Rachel to gather her belongings, Molly's passport was laying out of the safe and Rachel hid the key to the Barcelona apartment so Molly had no way to get back in. Molly was forced to called Study Abroad Apartments and have a new key made, arrange a meeting place to get the key, and pay money to have a new one made.

Once back in Barcelona, Rachel stepped up her bullying efforts: she made plans for future weekends to travel with all of their friends, deliberately leaving Molly out. And she made these plans in front of Molly.
Inside, Molly was so upset, but didn't want to show it. Rachel continued her mean streak by not talking to Molly, ever. Not in their tiny apartment, not anywhere. If Molly said something, she ignored her. And Rachel didn't invite her when she and the roommate went out. They were in classes together, and she and the roommate completely ignored her. Together, they would not acknowledge her. When Molly was showering, Rachel

would purposely take the electricity card out of the holder (European way of providing electricity) so Molly would be in the pitch dark while showering.

All bullying tactics.

Why would the other roommate, Alisa, go along with Rachel? Because in the sorority, it is generally understood that you do not cross Rachel Lader— better to pretend to be her friend, then be her enemy, as Molly was finding out. The other girls were frankly scared of Rachel. This was common knowledge among the sorority sisters.

Molly started crying to me everyday about Rachel. And saying she wanted to come home. Then the abuse got worse: Rachel would come back in the middle of the night from being out, while Molly was sleeping, invite people back at 4AM, blast music ,and talk about Molly, saying mean things, really loud so Molly could hear. She clearly wanted to wake up Molly, and she succeeded. Rachel did this constantly.

By this point, Molly was a wreck. She hid in her room so as not to see Rachel when she was in the apartment. A couple of times when Molly was using the bathroom, she told Molly she needed to use it immediately, so Molly would leave the bathroom, and Rachel would purposely stay in the bathroom for extended periods of time, so Molly couldn't get back in.

Note there was no physical bullying; this was all mental bulling. Both have been proven to lead to dire outcomes with teenagers. And Rachel revealed herself to be an expert bully, with a PhD in intimidation.

At this point, I called Study Abroad Apartments and asked if they could move her to a new apartment. I explained that Molly was being bullied. They said they had nowhere to move her to and to work it out with her roommate. The other roommate, Alisa just stood by and watched Molly being bullied. She did not speak up at all. We should prosecute her as well for being an accomplice. (Alisa later sent Molly a text saying she was sorry she didn't do something to stop it.)

I finally called Rachel's parents in mid February. I didn't want to say that their daughter was bullying Molly, because I didn't want to put them on the defensive. It was too important that the call remained civilized. I just said the girls are not getting along and could they talk to Rachel. They told me how much they love Molly, that Molly was there for Rachel at a very critical time the year before, and that we are all going to be in Barcelona visiting at the same time, so lets get together for dinner and work this out.

A few days later, I got a text from her mother saying that they would not be meeting us for dinner, and they hope Molly has a good life.

In the meantime, Rachel refused to pay Molly the $240 she owed her for the room in Prague. So I had to be nice to the mother once again and text her to pay us. She said she would, and luckily sent a check. I obviously couldn't say bad things about Rachel because I wanted the check. Molly was distraught by now with Rachel—things were at a very fragile emotional state.


At my encouragement, Molly tried her best to live her life abroad as normally as possible. There was a big music festival in Barcelona the second weekend in March. Molly had her friend from London staying with her and Rachel invited a Penn State friend to stay at the apartment. Rachel approached Molly's friend and said, "Why are you going out with Molly? You should be going out with us.!"  She said that right in front of Molly. By now, Molly had no fight left in her—the emotional abuse was so unrelenting.

Rachel brought kids back again in the middle of the night and blasted the music. Also, when Molly and her friend were out, Rachel dumped cooked pasta, along with the strainer, all over her sheets on her bed. The other girl visiting Rachel said to Molly she feels so bad for Molly that Rachel is being so mean to her. But no one had the guts to stand up to her.

When Rachel's friend left after the weekend, Molly was then scared to stay in the apartment. She didn't know what Rachel will do next to her personal

belongings. At this point, my husband and I were waking up to daily text messages from Molly, all in bold caps, expressing her fear and begging to come home.

After Rachel entered Molly's room and dumped the food on her bed, a boundary was crossed for the first time. Rachel was becoming more physical with her presence. Molly didn't know what would happen next. Panicked, Molly hatched a plan to flee the apartment in the middle of the night. She packed up her suitcases when Rachel was sleeping, and at 6:30 AM took all her stuff downstairs out of the apartment and hailed a taxi and moved into a hotel to stay for safe harbor. Molly was at her lowest point at the moment--living in a hotel by herself, all alone.

She begged us to bring her home, and was so depressed, Molly threatened to commit suicide.  That's a threat my husband and I could not take lightly. We always read about teenagers taking their lives from being emotionally bullied, so we knew this threat was real.

Molly was at the hotel for a week, when a good friend and sorority sister from Penn State (DChick) stepped in when she found out how bad it was for Molly. She offered Molly to come stay at her apartment, with her and her roommates. Molly slept on the couch for a month. DChick texted Rachel and said to her, "give me a good reason for doing this to Molly." There was no response. She had no good reason for this daily assault on Molly.

I called Study Abroad Apartments a second time to let them know what was happening. They tried to help find her another place to stay for the rest of the semester. But no luck. She talked to all the people at CEA. We let them all know what was going on. This was a terrible time in our lives and ruined Molly's whole semester abroad. She is traumatized from this whole experience. Molly has never been bullied and is very well liked. Molly has many friends. Rachael was one of them. But this girl just turned out to be a monster.

As a result of the trauma, Molly came early from study abroad in early April, had to forgo any academic credit, and needs to enroll in summer

school to make up the credits so she can graduate on time. The trip abroad was a complete disaster. Worse, she is not the same person: Molly remains traumatized, doesn't sleep, lays in her bedroom or on the sofa all day—she is depressed. Molly is also seeing a psychologist from the bullying. At age 20, she is a scared young woman, trying hard to re-build her life back to normal. This is not the joyful daughter we sent off to Barcelona in January.

Last year, Molly, Rachel and two other sorority sisters signed a lease for an apartment for their senior year at Penn State. How in the world are they supposed to live together? Rachel has no problem moving in to that apartment, because she has a hunch that Molly will be too afraid to live with her. She is correct. But why should Molly move out of a great apartment when she was the victim? They got this apartment the beginning of their sophomore year.

As a parent, it is very hard to watch your child being bullied in a country far away. There weren't a lot of options for us. And I believe this series of incidents took years off the lives of my husband and I. Rachel Lader had a fun semester overseas, careless about the impact to our daughter. There has been zero accountability for her.  Now we believe Rachel should not be allowed to ruin my daughter's senior year at Penn State, and should be dismissed immediately as a student. As my husband says, Rachel clearly does not embody the values of this great university.

## Additional Perspectives from Molly:

My first weekend abroad trip to Copenhagen I was having trouble adjusting to Europe. Nobody woke me up in the morning to go tour with them, and I was so upset that I decided to go to another hotel for the night. Never got a text or anything asking where I was or if I was ok.

After Copenhagen: I was ignored and Rachel made me feel awkward and

uncomfortable in my own apartment. I invited her to London with me to visit my best friend because I did not want her to treat me poorly and be terrible to me in the apartment.

In London: She was extremely rude and demanding to my friend and we just tried to stay as far away as possibly--my goal was to try to be as nice as possible and make the best out of every situation, so things could be as normal as possible. She kept making comments about other people's looks in the apartment and was acting as if she was better than them the entire time, when in reality she didn't even know them. I think that is a horrible personality flaw, because people cannot help what they look like. But that is so typical of Rachel.


Before Prague: Rachel started ignoring me and making me feel uncomfortable in our own apartment. I was going to Prague with all my home friends and she was going to Switzerland with school friends. All the Switzerland friends dropped out to stay with our school friends in Prague, but nobody wanted Rachel to stay with them. My parents convinced me to take the high road, so I got a second hotel room to make sure she could go, even though she was being mean to me in our apartment. I couldn't continue to be treated wrong and thought this was the best way to solve this.

After Prague: Rachel never spoke to me again. My parents recommended, even though I knew I was right and she was wrong, to reach out and try to make peace with her to make the rest of the semester enjoyable. I did, and I never heard back and we never spoke again. She never once spoke to me neither in person nor over the phone. She would make travel plans while I was in the room, intentionally to hurt me and not include me in any of it.

I would go to the bathroom and she would continue to knock on the door till I would leave, then would lock me out of the bathroom for extended periods of time purposely so I could not use it. She would come back late at night and intentionally blast music to try to wake me. When I was in the shower, she would pull the electricity to it would shut off on me purposely.

She told a massive lie to all my friends about what happened to try to intentionally turn people against me, because she knew she was wrong. She poured pasta and a strainer on my bed, which she says was because I never cleaned the dishes, which is false because I had a friend that weekend and we ate out every meal, because we didn't want to be in the apartment.

Rachel bullied me to the point where I had to leave in the middle of the night in an area where people get stabbed outside my building. Whenever I think about it, it brings me to a full on terrible place and makes me completely depressed.

Rachel has a terrible reputation and got in trouble in high school for bullying as well. You should check that out. If all of this is not proof of what kind of person she represents, I don't know what else is.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT F

# Rachel Lader's Request for the Dismissal of Charges

To:     Office of Student Conduct
        120 Boucke Building
        University Park, PA  16802
        **Attention**: Karen Feldbaum, *Associate Director,* at kxf6@psu.edu

I am making a written request for the conduct charges 03.99/Harassment – Other against me, Rachel Lader be dismissed.  The alleged conduct complained of by Molly Brownstein is without any merit and is nothing more than slander and harassment by Molly Brownstein and her Mother, Amy Brownstien and to have me thrown out of school.

The Student Guide to University Policies and Rules defines Harassment as:

"behavior that is sufficiently severe or pervasive so as to threaten an individual or substantially interfere with the individual's employment, education or access to University programs, activities or opportunities, and that would detrimentally affect a reasonable person under the same circumstances.

Behaviors that meet the above definition may include, but are not limited to, the following:

- directing physical or verbal conduct at an individual because of the individual's age, race, color, ancestry, national origin, religion, creed, service in the uniformed services, veteran status, sex, sexual orientation, marital or family status, pregnancy, physical or mental disability, gender identity, genetic information or political ideas;

- subjecting a person or group of persons to unwanted physical contact or threat of such; or

- engaging in a course of conduct, including following the person without proper authority (e.g., stalking), under circumstances which would cause a reasonable person to fear for his or her safety or the safety of others or to suffer emotional distress.

Molly Brownstein allegations of not being included on weekend trips, was being ignored and I did not speak to her do not amount to the University's definition of harassment. Even the Office of Student Conduct's investigator, Spencer notes in his summary does not support any harassment charges.  He states the following in his report:

1. Brownstein stated everything was "really just a blur";
2. When asked to give specific examples of what occurred, "she stated it was difficult to recall exact details;"
3. "Brownstein could not provide more specific examples of what was actually said to her"

4. Three witnesses were produced by Molly Brownstein and interviewed by Spencer
   a. Lindy Schwartz, who stated she did not personally observe any of the alleged conduct or observe any physical altercations.
   b. Danielle Chikkawwswamy, also stated that she did not observe or experience any of the alleged conduct being complained of.
   c. Marina Janzer, a very close friend of Molly Brownstein from high school, was never interviewed by Spencer but sent a very biased email.

Importantly, neither Lindy Schwartz nor Danielle Chikkawwswamy both stated that they never witnessed any improper conduct by me, Rachel Lader. In fact, Spencer omits from his report and failed to interview Brandon, a mutual friend of Molly and myself, who Danielle Chikkawwswamy stated to both of us that **Molly told her to lie to Penn State about me (Rachel) bullying her so that she could try and get me kicked out of school**. I provided him with the text message Brandon sent me but this has been ignored. This with the fact that Danielle states that she never witnessed anything personally, corroborates that Molly's allegations against me are untrue.

I was provided with a statement in which Molly's Mother, Amy Brownstein makes several slanderous and libel statements. First Mrs. Brownstein states that Molly was being ignored and wasn't invited when we went out. She stated ""she made plans for future weekends to travel…deliberately leaving Molly out." Yet months prior, Mrs. Brownstien stated in a text to my mother "Molly was invited to dinner but had something to do for Spanish class and couldn't make half the dinner so she didn't go. Of course she told me she was sitting alone tonight for dinner for sympathy" Mrs. Brownstein even stated "Yeah that makes sense that Molly did not want to sightsee. I am sure she is not 100% innocent in all of this." Yet now Mrs. Brownstein is out right lying and saying just the opposite to support Molly's crusade against me. Her statements are inconsistent. Even Alissa, who was also never interviewed, stated in a text "She [Molly] just separates herself from us. She does it to herself…" Molly would often seclude herself from everyone else by eating dinner by herself or staying in her room by herself and that had nothing to do with me.

Further, Mrs. Brownstein claims that because Molly did not complete here Study Abroad Program, she has to enroll in summer school in order to graduate. This statement is completely untrue. Contrary to her mother's statement, Molly confided in me prior to the Study Abroad Program, that she won't have enough credits to graduate because she failed many classes. She also told me she did not know what she was going to do because she could not tell her parents. Even if she completed the program, she still would not have nearly enough credits to graduate on time. I am sure her transcript will reveal that information.

For all the reasons stated above, I request that conduct charge of harassment be dismissed against me.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*


# <u>EXHIBIT G</u>


# Mr. Durante's Letter of Reference


# (dated June 21, 2016)

# Syosset Central School District

Dr. Thomas L. Rogers
Superintendent of Schools

Syosset High School
70 Southwoods Road
Syosset, New York 11791-3200

| Administrative Assts. | 516-364-5680 |
| Attendance | 516-364-5683 |
| Guidance | 516-364-5686 |
| Main Office | 516-364-5675 |
| Nurses' Office | 516-364-5696 |
| FAX | 516-921-6032 |

Dr. Jeffrey B. Streitman
Deputy Superintendent of Schools
364-5647

Dr. Giovanni Durante
Principal

Raymond Gessner
Christopher Ruffini
Assistant Principals

Thomas Allen
Gerri Alper
David Balsamo
Thomas Fusco
Maryanne Rinaudo-Concessi
Administrative Assistants

**Letter of Reference for Rachel Lader**
**Syosset High School, New York**

June 21, 2016

To whom it may concern,

Rachel Lader graduated from Syosset High School in 2013 and was an exemplary student both inside and outside of the classroom. Rachel was respected by her peers and teachers alike and did not pose any issues in our school or larger community. In fact, Rachel was a true humanitarian that dedicated her bat mitzvah to raising money for a benefit named "Realizing the Dream," which is a nonprofit group that strives to continue the work of Dr. Martin Luther King Jr. Rachel Lader defines the acronym PRIDE, which is our Character Education Program: Patience, Respect, Integrity, Dignity and Empathy. In fact, Rachel was nominated to our PRIDE Wall, where we highlight students that demonstrated one of the attributes of PRIDE and helped combat bullying.

Rachel Lader is a respected member of our school community and I urge you to contact me at 516-364-5675 if you need additional information.

Sincerely,

Giovanni Durante, Ed.D.
Principal, Syosset High School

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT H

# Mr. Peters' Final Report

SPENCER'S SUMMARY OF INFORMATION PERMITTED TO BE REPORTED:

On 4/28/16 at approximately 3:00 pm, I contacted Molly Brownstein regarding reported harassment she was experiencing from another student. She indicated that Rachel Lader has been "bullying" her during their time studying abroad.

I was able to speak with Brownstein more about what was occurring between her and Lader. Brownstein explained she was a close friend with Lader and they had met through their sorority their freshman year. She explained they were never roommates prior to studying abroad, but resided on the same floor in Ewing Hall. Further, Brownstein stated there were no problems during that time. However, Brownstein indicated that Lader did treat Lader's roommate poorly during that time. However, now the two get along.

I asked Brownstein to explain what was going on between her and Lader. She explained that they were roommates in Barcelona in January, 2016. Further, the issues began in February. She explained this really began around the time they were in Prague. Brownstein reported Lader was supposed to go to Switzerland with several friends. However, the friends changed their minds and planned to go to Prague instead. She explained this upset Lader since she wanted to go on this trip and everyone backed out. However, Brownstein ended up allowing Lader to stay with her during the time in Prague. Brownstein stated while in Prague, Lader wanted to bring a male back to the room while Brownstein was there. Brownstein stated she told Lader she did not want this to occur and was concerned the two planned on having intercourse. However, Brownstein explained Lader ignored this and brought this male anyway. As a result, Brownstein had to leave and not stay at the room and stayed with another friend. Brownstein explained she attempted talking with Lader, but this never occurred.

Brownstein stated in Barcelona the relationship was bad and really just a blur. She explained Lader would blast music early in the morning and dumped cooked pasta on Brownstein's bed. She explained she had to move out (into a dangerous neighborhood) as a result of how she was treated by Lader. I asked Brownstein to provide specific examples of what occurred. She stated it was difficult to recall exact details. However, Lader would say mean things about her. For example, Brownstein stated Lader would tell people to throw trash in her room. She continued to say it was a very traumatic experience while she was studying abroad. She stated she attempted texting Lader to talk about the issues, but this did not work. Further, it got bad enough that her parents contacted Lader's parents.

Brownstein could not provide more specific examples of what was actually said to her. However, she later mentioned how Lader would turn the electric off at the room while Brownstein was showering.

On 5/5/16 at approximately 1:30 pm, I contacted Lindy Schwartz.  She agreed to provide information for this case.  Schwartz stated she knows individuals do not like Lader.  Further, she explained Lader was rude, would blast music (not personally seen), and not talk to Brownstein.  Further, she did observe this for a few weeks while with Brownstein in Barcelona.  She explained the problems began in Prague when Lader brought a male back to their shared hotel room.  Schwartz also stated she knows Brownstein was locked out of the room and had to stay with Schwartz, Lader refused to provide a safe combination in order for Brownstein to get her passport, and would smoke marijuana in the room while on this trip.  She explained that while in Barcelona, Lader would purposely not let Brownstein into their room.  As a result, Brownstein had to stay with other friends to include Schwartz.  Further, Lader was attempting to get others to turn against Brownstein.  Schwartz stated she was told by Brownstein that Lader would not include Brownstein in social activities such as meals.  She was also told that Lader dumped paste on Brownstein's bed.  However, she personally did not see this occur.  I asked if she observed any physical altercations, and she stated no.  She only knows that Lader has a bad reputation and is rude.


On 5/6/16 at approximately 1:55 pm, I spoke with Danielle Chikkawswamy.  Chikkawswamy stated she was aware of the issues between Lader and Brownstein, but never observed this occur.  She was told that Lader was not very nice and was not including Brownstein in activities.  Further, things were so bad between Brownstein and Lader that Brownstein lived with Chikkawswamy for 3 weeks.  Chikkawswamy stated that Brownstein felt invisible while living with Lader and did not know what she did to Lader.  Further, that Brownstein was crying a lot as a result of the situation.  She was also told about the pasta being dumped on the bed and had heard about Brownstein having to stay in a hotel.  As a result, she told Brownstein to stay with her.  Chikkawswamy had no issues she personally experienced with Lader, and could provide no further information.


On 5/9/16, I was able to get an email statement from Marina Janzer regarding this case.  Janzer is currently out of the country and I could not speak directly with her.  The email statement is in the case file.


On 5/18/16 at approximately 10:40 am, I was able to speak with Lader.  I explained to Lader why I was calling and she agreed to speak with me.


She stated issues really began prior to the Prague trip.  She stated there were two other weekend trips while studying abroad that caused issues.  She stated on one occasion the group was ready to begin their day, but Brownstein remained in bed.  At 2:30 pm, Brownstein reached out and was upset about not being included in the activities.

I asked more about what occurred in Prague that caused their issues to escalate.  Lader stated she did not what to be roommates with Brownstein based on the other weekend trips.  However, she did and had to stay at a hotel 30 minutes outside the city away from the others in the group as a result.  She explained that a male friend was locked out of his room and asked to stay with Lader.  Lader stated she agreed.  She denied there was any intent to engage in intercourse (as alleged by Brownstein) while at the room, and Brownstein knew this.  This friend did come back to the room and this upset Brownstein and she left the hotel.  Lader explained this male was a longtime friend that she grew up with, and was only trying to help him since he was locked out of his room.  Further, she simply asked that he could sleep on their couch.  She also had texts to prove this.  Lader then went on to say how she was tired of cleaning up after Brownstein during their time together.  She explained that Brownstein would allow trash to overflow and would not clean her dishes, and leave pasta in the drain clogging it.  I asked about placing paste in Brownstein's bed and she denied this occurred.  However, admitted to placing a colander in the bed.

I asked Lader about shutting off the electricity in the room while Brownstein was showering.  Lader denied this occurred.  Further, she stated the two never talked.  I asked about refusing to give Brownstein a safe combination.  She stated she was never directly asked for this combination.  She stated Brownstein asked Chikkawswamy for this combination and Lader gave it to her.

Lader stated she felt Brownstein would isolate herself on her own.  She gave the example of Lader staying in her room while others watched TV.  She also stated Brownstein would not eat at the same times while at the apartment.

Lader did provide several texts that she believes supports her position.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# <u>EXHIBIT I</u>

Email from Ms. Feldbaum to Rachel Lader

(dated June 6, 2016)

**Update**

**From:** KAREN FELDBAUM <kxf6@psu.edu>
**To:** Rachel Lader <rachellx17@aol.com>
**Cc:** djakerachel <djakerachel@aol.com>
**Date:** Mon, Jun 6, 2016 10:10 am

Hello Rachel,

I reached out to Molly last week and have been in touch with her family over the weekend.  There may be some interest in a mediation.  I have yet to speak with Molly directly but hope to do that in the next few days. I just wanted you to know.

Thanks.
Karen

--
Karen Feldbaum
Associate Director, Office of Student Conduct
120 Boucke Building
University Park, PA  16802
814-863-0342
http://studentaffairs.psu.edu/conduct

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT J

Student Conference Summary Form for
Rachel Lader

## STUDENT CONFERENCE SUMMARY FORM
### Penn State University – Office of Student Conduct/Community Standards

| 1. Name: Last, First Middle | 2. ID Number |
|---|---|
| Lader, Rachel | ▮▮▮▮▮ |

**3. Charge Code/Violation(s):**

03.99 / Harassment - Other

**4. Sanction(s):**

Conduct Probation through  FA2016
Educational Program Related to the Behavior    Due: 8/15/2016

**5. Parental Notification** ☐ Applies  ☒ Does not apply

You have been charged with violation(s) of the University's Student Code of Conduct. You have the right to share information about the incident with a Case Manager. If there is enough information to reasonably support a Code of Conduct violation, a sanction(s) will be assigned. Sanctions are assigned taking into consideration the nature of the incident, any past conduct history, precedents for similar violations, potential or actual impact to the community, educational impact, and other specific circumstances of the incident.

▶ **PLEASE READ AND INITIAL THE FOLLOWING STATEMENTS:**

_____ I have read and I understand the above statement, and I have been informed of the allegation(s).

_____ I understand that if I accept the charge(s) and sanction(s), the sanction(s) will go into effect immediately, unless otherwise indicated.

_____ I understand I can contest the charge(s) and request a Hearing.

_____ If the recommended sanctions include a Probation with a Transcript Notation or a form of separation (i.e., Suspension, Indefinite Expulsion, or Expulsion), I understand that I can request a Sanction Review.

_____ If a housing contract termination has been assigned, I understand I can request that the termination be reviewed by the Senior Director of Residence Life or Residence Life Designee.

_____ I understand that I may take three (3) business days to respond to the charge(s) and/or the sanction(s).  I understand that if I do not do so, the charges and sanctions listed above will be assigned without further notice or option for review.

▶ **PLEASE CHOOSE ONE OF THE FOLLOWING COURSES OF ACTION:**

| I accept the charges and sanctions as assigned. | I contest the charge(s) and request a Hearing. | I accept the charges but request a Sanction Review and/or a review of the housing contract termination. |
|---|---|---|
| Signature                    Date | Signature                    Date | Signature                    Date |

| OFFICE USE ONLY | **Case Manager Signature** | **Date** |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# **EXHIBIT K**

# Email from Ms. Feldbaum to Andrew Shubin

# (dated June 15, 2016)

From: KAREN FELDBAUM <kxf6@psu.edu>
Subject: Penn State Student Conduct
Date: June 15, 2016 at 11:46:43 AM EDT
To: Andrew Shubin <shubin@statecollegelaw.com>
Cc: Rachel Lader <rachellx17@aol.com>

Hello Andy,

Per Rachel's request, I am sending correspondence to you.
I have been in touch with Molly and she was not interested in the alternative options
provided. As such, we will move forward with the hearing.

Rachel has provided some information to me however, there is a person named Brandon with
whom I would like to speak to determine if he would be an appropriate witness. I would like his
contact information as well as the names and contact information for any other possible
witnesses no later than Wednesday, June 23rd. This would not preclude additional witnesses
added if they are not currently identified but for those identified at this point such as Brandon, it
would be important that I have his information by the 23rd.

Also, some witnesses have expressed some concern regarding their participation in our process
possibly resulting in retaliation. I just want all involved to understand that any retaliation which
occurs as a result of a person's interest in participating in our process would be considered for
another possible violation of the code of conduct.

As I will be traveling next week, I do not believe the hearing will be scheduled prior to the first
of July. I will be back in touch once we determine some possible options.

Thanks.
Karen

----- Original Message -----
From: "Rachel Lader" <rachellx17@aol.com>
To: "karen Feldbaum" <kxf6@psu.edu>
Sent: Tuesday, June 14, 2016 10:46:34 AM
Subject: All Communication

Karen

As I indicated yesterday, Attorney Andrew Shubin is my advisor and you should direct future
correspondence to him. Thank you.

Rachel Lader

Sent from my iPhone
--

Karen Feldbaum
Associate Director, Office of Student Conduct
120 Boucke Building
University Park, PA  16802
814-863-0342
http://studentaffairs.psu.edu/conduct

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# <u>EXHIBIT L</u>

# Emails Exchanged Between Andrew Shubin and Danny Shaha

# (dated June 23, 2016)

From: Danny Shaha <jds49@psu.edu>
Subject: Re: Lader
Date: June 23, 2016 at 12:02:39 PM EDT
To: Andrew Shubin <shubin@statecollegelaw.com>
Cc: Karen Feldbaum <kxf6@psu.edu>

Correct on both. Since this is not title IX nor a crime of violence, the specifics of the sanction would not be shared with the other party. And they have no right to know about external non-disclosure.

Danny

On Jun 23, 2016, at 11:28 AM, Andrew Shubin <shubin@statecollegelaw.com> wrote:

Can you confirm that the details of Ms. Lader's resolution are confidential and covered by FERPA — and would not be shared with the accuser?  Also any application or approval of external nondisclosure would not shared?

Thanks!


Andrew Shubin
Andrew Shubin Attorney at Law, Inc.
333 South Allen Street
State College, PA 16801

(814) 867 3115
Fax: (814) 867-8811

shubin@statecollegelaw.com
www.statecollegelaw.com


This electronic mail transmission is privileged and confidential, and is intended only for the review of the party or parties to whom it is intended to be sent. If you have received this message in error, please immediately return it to the sender with a notation of "Wrong Address" in the subject line, then delete it from your computer system.  Unintended transmission to a wrong address shall not constitute a waiver of the attorney-client or any other privileges.  Thank you for your cooperation.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT M

Letter from Andrew Shubin to Danny Shaha

(dated June 27, 2016)

**ANDREW J. SHUBIN**
**ATTORNEY AT LAW, P.C.**
333 SOUTH ALLEN STREET
STATE COLLEGE, PENNSYLVANIA 16801

ANDREW SHUBIN
SHUBIN@STATECOLLEGELAW.COM

SEAN MCGRAW
MCGRAW@STATECOLLEGELAW.COM

PHONE 814-867-3115
FAX   814-867-8811
WWW.STATECOLLEGELAW.COM

June 27, 2016

Danny Shaha, Senior Director
Office of Student Conduct
The Pennsylvania State University
120 Boucke Building
University Park, PA 16802

Via electronic mail to jds49@psu.edu.

    Re:  Rachel Lader

Dear Danny:

    I write to thank you for meeting with me and confirming the confidentiality of the disciplinary and external nondisclosure process.  Rachel has indicated to me that she intends on applying for nondisclosure shortly after July 9 so that she can be confident that she is presenting the strongest possible application for Fall 2017 law school admission.

    Recall that Ms. Brownstein implored your office to "check out" Rachel's high school record to support her claim that Rachel had a "terrible reputation and got in trouble in high school for bullying as well."  I enclose for your file the letter I showed you yesterday from Syosset Central School District Principal's Giovanni Durante's which, I am sure you will agree, describes a singularly impressive and accomplished young woman and which stands in stark contrast to what her accuser and accuser's mother presented to your office.

    I know it is important to Rachel to meet with you so that you can see what kind of kid she is and so that she can share her goals for the coming year with you.  Thanks for agreeing to meet with her.

                    Very truly yours,

                    Andrew Shubin
                    Attorney at Law

Enclosure
cc:  Rachel Lader

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*Rachel K. Lader v. Marc A. Brownstein et al.*

# <u>EXHIBIT N</u>

## Email from Kathy Moore

## (dated July 7, 2016)

# Re: Centre Court #308

## 16-088 Lader, Rachel

**Email**

---

07/08/2016

**From**

Andrew Shubin <shubin@statecollegelaw.com>

**To**

Hi Kathy

I am a Lader family friend and they asked me to reach out to you and to confirm that the roommate that has decided not to move in is Molly Bronstein? Thanks.

Andrew Shubin
Andrew Shubin Attorney at Law, Inc.
333 South Allen Street
State College, PA 16801

(814) 867 3115
Fax: (814) 867-8811

shubin@statecollegelaw.com
www.statecollegelaw.com

This electronic mail transmission is privileged and confidential, and is intended only for the review of the party or parties to whom it is intended to be sent. If you have received this message in error, please immediately return it to the sender with a notation of "Wrong Address" in the subject line, then delete it from your computer system. Unintended transmission to a wrong address shall not constitute a waiver of the attorney-client or any other privileges. Thank you for your cooperation.

From: "Kathy Moore" >
Date: July 7, 2016 at 5:14:54 PM EDT
To: >, >, >, >, >, >, >, >

Subject: Centre Court #308

Dear Future Tenants and Guarantors,

It has come to our attention that there has been a falling out amoung the roommates on the lease for for the 2016-2017 lease term. There are two options available in order for the group to proceed.

1) The tenants may choose to find a replacement tenant for any person(s) leaving. In order to do this, there is a fee of half of one month's rent or $1850.00. Replacement tenant(s) must be found, all of the roommates must approve of any replacement person. Any new person would complete an application, submit it with a $40 application fee. We will then give them a parental guaranty form. Once the guaranty form has been completed and returned and the fees have been paid, we will circulate a new lease for signatures. AFTER the new lease is signed, the old tenant(s) wil be released.
2) If none of the tenants want the apartment if any of the roommates are not a part of the group, ARPM would have to re-rent the WHOLE apartment. The fee to do that is one month's rent, $3700.00. The group is released AFTER a new lease has been signed.

Please understand that everyone is still bound to the lease as it stands. However, when it comes to move in day, it is unlikely that anyone not living I the apartment will pay August rent. If the rent isn't paid in full, no one will be given keys. It makes sense to deal with this situation as quickly as possible so the roommates, and their parents as guarnators, are not in limbo.

Contact our office with any questions.

Sincerely,

Kathy Moore
Rental Supervisor
Associated Realty Property Management
456 E. Beaver Avenue, State College, PA 16801
Phone: 814-231-3333 / Fax: 814-234-6697
Visit us on the web @ http://www.arpm.com
kam@arpm.com
"Don't ride the BUS….Live with us!"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*Rachel K. Lader v. Marc A. Brownstein et al.*

# EXHIBIT O

Email from Marc A. Brownstein

(dated July 14, 2016)

From: Marc Brownstein <Marc@brownsteingroup.com>
Subject: Re: Centre Court #308
Date: July 14, 2016 at 12:43:02 PM EDT
To: Andrew Shubin <shubin@statecollegelaw.com>, "kam@arpm.com" <kam@arpm.com>
Cc: "cwolff@optonline.net" <cwolff@optonline.net>, "robinkmichaels@gmail.com" <robinkmichaels@gmail.com>, "aewolff@optonline.net" <aewolff@optonline.net>, "mob5534@psu.edu" <mob5534@psu.edu>, Donna <djakerachel@aol.com>, "carlymichaels95@yahoo.com" <carlymichaels95@yahoo.com>, "rkl5057@psu.edu" <rkl5057@psu.edu>

Andrew,

I want to clarify an assumption in your email blast. "Ms. Brownstein" (my daughter, Molly) did not make a decision to not take the apartment.

You were hired because the roommate situation has a unique dynamic. Rachel has recently been convicted of Harassment, and sanctioned with a level of University Probation by the Office of Student Conduct at Penn State University, for bullying actions taken against Molly during their time in Barcelona. Molly & Rachel were roommates there.

All the best,

Marc Brownstein


From: Andrew Shubin <shubin@statecollegelaw.com>
Date: Friday, July 8, 2016 at 7:28 PM
To: "kam@arpm.com" <kam@arpm.com>
Cc: "cwolff@optonline.net" <cwolff@optonline.net>, "robinkmichaels@gmail.com" <robinkmichaels@gmail.com>, Marc Brownstein <marc@brownsteingroup.com>, "aewolff@optonline.net" <aewolff@optonline.net>, Molly Brownstein <mob5534@psu.edu>, Donna <djakerachel@aol.com>, "carlymichaels95@yahoo.com" <carlymichaels95@yahoo.com>, "rkl5057@psu.edu" <rkl5057@psu.edu>
Subject: Centre Court #308

Hi Kathy

I write on behalf of the Lader family and in response to the email you sent regarding Ms. Brownstein's decision not to take possession of the above referenced apartment. The Lader's have asked me to confirm that they are willing to be solely responsible for paying Molly's portion of the rent for the entire term and have asked me to work with you to prepare a document reflecting this arrangement. To be clear, the Lader's want you and the other roommates and their families to understand that they wish to fashion a written guarantee that they are undertaking this responsibility.

Let's touch base next week to get the paperwork moving. Thanks!

Andrew Shubin
Andrew Shubin Attorney at Law, Inc.
333 South Allen Street
State College, PA 16801

(814) 867 3115
Fax: (814) 867-8811

shubin@statecollegelaw.com
www.statecollegelaw.com

This electronic mail transmission is privileged and confidential, and is intended only for the review of the party or parties to whom it is intended to be sent. If you have received this message in error, please immediately return it to the sender with a notation of "Wrong Address" in the subject line, then delete it from your computer system.  Unintended transmission to a wrong address shall not constitute a waiver of the attorney-client or any other privileges.  Thank you for your cooperation.